**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KRISTIN CARLSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PNC FINANCIAL SERVICES GROUP, INC., | ) | |
| PNC BANK, N.A., | ) | |
| TIMOTHY CARLSON, | ) | CIVIL ACTION NO.: 2:25-CV-05702-JHS |
| MURRAY WILSON, | ) | |
| WILLIAM RATHMAN, JR., | ) | |
| VORYS, SATER, SEYMOUR AND PEASE LLP, | ) | |
| ERNST & YOUNG LLP, | ) | |
| MARIE TORMEY, | ) | |
| LAURA LONG, and | ) | |
| WILLIAM DEMCHAK, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**
**JURY TRIAL DEMANDED**

Samuel C. Feldman, Esq.
FELDMAN LAW FIRM PLLC
71 Northeast 27th Avenue
Pompano Beach, FL 33062
T: 954-682-8590
F: 954-941-7003
E: sam@feld.law

*Counsel for Plaintiff Kristin Carlson*

## INTRODUCTION

1. This case challenges how PNC Bank, N.A. ("PNC"), as corporate trustee, drew $427,000 from the Trust as estimated-tax withdrawals after a 2024 property sale, routed those funds through an internal PNC account, and still cannot produce neutral IRS or state confirmations that the taxes were paid.

2. Plaintiff alleges that PNC misclassified the sale, used a $0/"unknown" cost basis despite existing tax-cost records reflecting a basis of $489,363.67, and—together with its outside professionals—relied on internal spreadsheets and a check image instead of corrected accountings and third-party proofs.

3. On behalf of herself and a class of beneficiaries, Plaintiff seeks surcharge and related remedies for breach of trust and professional misconduct, a full fiduciary accounting with neutral confirmations, restoration of wrongfully paid or withheld Trust funds, removal or suspension of unfit trustees, and forward-looking controls requiring neutral confirmations for substantial Trust disbursements.

## PARTIES AND TRUST STRUCTURE

### A. Parties

4. Plaintiff: Current beneficiary of the Ernest D. Rathman & Marguerite Sebald Rathman Trust u/a/d March 4, 1963 (the "Trust"). Plaintiff receives information and distributions from the Trust and has standing to seek damages, surcharge, accounting, and equitable relief for fiduciary breaches affecting the Trust.

5. PNC Bank, N.A. ("PNC"): National bank and corporate co-trustee; administers trust assets, books and records, reporting, and tax remittances in this District.

6. The PNC Financial Services Group, Inc. ("PNC Financial"): Pennsylvania parent that oversees enterprise fiduciary services offered under the PNC brand. PNC Financial is vicariously liable under agency and respondeat superior for acts and omissions of personnel performing these services within the scope of their authority, and for conduct directed or ratified by PNC Financial officers.

7. Individual Co-Trustees: Timothy Carlson, Murray Wilson, and William Rathman, Jr.

8. Officer Defendants: Marie Tormey (Chief Fiduciary Officer), Laura Long (General Counsel), and William Demchak (Chief Executive Officer)—officers with authority over fiduciary-services policies, reporting, and responses to beneficiary oversight.

9. Outside Professionals: Ernst & Young LLP ("EY") (tax advisor during the estimated-tax period) and Vorys, Sater, Seymour and Pease LLP ("Vorys") (outside litigation counsel).

**B. Trust Structure**

10. The Trust is irrevocable and administered *per stripes.*

11. PNC and the three individual co-trustees administer jointly—maintaining accounts and records, reporting, tax payments, and distributions.

**C. Administration and Duties**

12. As corporate co-trustee, PNC handles the Trust's banking, tax remittances, books and records, and beneficiary reporting.

13. Trustees must act loyally and prudently and keep accurate, auditable books. For substantial disbursements, the ordinary records include neutral third-party confirmations (e.g., taxing-authority acknowledgements or bank routing/trace data).

**<u>JURISDICTION AND VENUE</u>**

**A. Subject-Matter Jurisdiction**

14. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and Plaintiff is a citizen of a different State than each Defendant (complete diversity). The Court also has supplemental jurisdiction over any related state-law claims under 28 U.S.C. § 1367(a).

**B. Personal Jurisdiction**

15. PNC purposefully conducts trust-administration work for this matter through PNC's Philadelphia operations; the claims arise from those forum-directed activities.

16. PNC Financial is incorporated in Pennsylvania and is "at home" here; in all events it directs and benefits from the Philadelphia-based fiduciary services policies at issue.

17. Individual Co-Trustees/Officer Defendants directed, approved, or ratified trust-administration policies and responses implemented from Pennsylvania; the claims arise from those forum-directed acts.

18. Outside Professional Defendants purposefully performed trust-related tax/reporting work tied to PNC's Philadelphia operations; the claims arise from that forum-connected engagement.

19. If any defendant contests personal jurisdiction, Plaintiff requests limited jurisdictional discovery.

**C. Venue**

20. Venue lies in this District under 28 U.S.C. § 1391(b)(1)-(2): PNC Financial resides here, and a substantial part of the operative events was coordinated from Philadelphia. PNC's

own remittance instrument in this matter bears the header "PNC Bank, N.A., Philadelphia, PA." (Ex. 7B).

**D. Convenience / Interests of Justice**

21. Key witnesses, records, and policy materials are located or administered in this District. Centralized, classwide injunctive/accounting relief can be most efficiently supervised here. Transfer would shift, not reduce, burden and would not better serve the interests of justice.

## CLASS ALLEGATIONS

22. Plaintiff brings this action under Fed. R. Civ. P. 23 based on Defendants' uniform trust-administration practices.

**A. Class Definition and Timeframe**

23. Class: All current or former beneficiaries of PNC-administered trusts for whom, during the Class Period, Defendants (i) withheld neutral third-party confirmations/trace data for tax remittances or material disbursements, and/or (ii) misclassified or failed to correct material transactions in trust statements.

24. Exclusions: Defendants; their officers, directors, employees, agents; outside counsel and firms; the presiding judge/chambers; opt-outs; and beneficiaries who were trustee-defendants.

25. Class Period: At least April 15, 2024 through filing (and prospectively for injunctive relief); the start date may be set at certification from standardized records.

**B. Rule 23(a) Requirements**

26. Numerosity: At least ten beneficiaries across PNC-administered trusts; joinder is impracticable.

27. Commonality: Common questions include whether trustees must provide neutral third-party confirmations for remittances/disbursements, whether internal numbers or spreadsheets suffice, and whether PNC breached its fiduciary duties to the Trust and the name beneficiaries.

28. Typicality: Plaintiff's claims arise from the same practices and duties as the class. Plaintiff's claims are typical of those held by absent class members, and Plaintiff is not subject to any unique defenses.

29. Adequacy: Plaintiff has no conflicts, has experienced counsel, and will prosecute classwide injunctive and monetary relief.

**C. Rule 23(b)(3) — Predominance and Superiority**

30. Liability and impact are provable with common evidence (policies, logs, standardized statement/remittance data, communications); classwide methods will show surcharge/ disgorgement and make-good costs; a class action is more efficient and avoids inconsistent outcomes.

31. Ascertainability: Membership is objectively determinable from PNC records (statement fields, remittance logs, ACH/NACHA data, check images).

**D. Choice of Law**

32. Ohio trust law governs many claims; any variations are manageable by subclasses or issue certification.

**E. Classwide Relief**

33. Declaratory and injunctive relief (neutral confirmations/trace data; corrected accounting/reporting); restitution/surcharge/disgorgement; compensatory damages where applicable; pre- and post-judgment interest; attorneys' fees and costs; and further just relief.

## GENERAL ALLEGATIONS

### A. Overview

34. This case challenges uniform trustee-administration practices: (i) misclassifying a 2024 property sale in beneficiary statements; (ii) claiming large April 4, 2025 estimated-tax remittances for 2024 taxes without neutral third-party confirmations or trace data; and (iii) withholding those neutral confirmations after written requests.

35. Plaintiff made written requests on May 7 (Ex. 4), May 14 (Ex. 6), and May 21, 2025 (Ex. 8) for IRS/EFTPS acknowledgements, state deposit receipts, and ACH/NACHA routing/trace data. Defendants produced internal artifacts instead of third-party proof.

### B. Core Facts

36. Sale misclassification (2024): PNC's 2024 quarterly and year-end statements labeled April 2024 sale proceeds as "Rent/Investment Income." (Ex. 2A.) No corrected beneficiary statements were issued.

37. Sale-records request (June 28-30, 2025): Plaintiff requested the closing statement, wire/ACH confirmations, deed/escrow, and internal tie-outs for the April 2024 sale. (Ex. 13A.) Trustees (through counsel) called the request "somewhat unusual" and did not produce those neutral records (Ex. 13B); on Aug. 12 they produced only a HUD/closing statement—still no wire/ACH confirmations, deed/escrow, or tie-outs.

38. Estimated-tax remittances (April 4, 2025): Defendants reported $427,000 as "PAID EFTPS" ($370,000 federal; $45,000 Ohio; $12,000 Kentucky) (Ex. 3), but produced no neutral confirmations (IRS/EFTPS, state, or ACH/NACHA). EFTPS is federal-only and does not process state payments, so EFTPS records cannot verify the Ohio or Kentucky remittances and no Kentucky-source income has even been identified for the 2024 year.

39. Routing: PNC claims the payments went through an internal account (ending in …4718) as a standard tax practice. Even if ordinary, that routing does no replace neutral third-party confirmations, which were not produced.

40. Ohio check image: In response to requests for neutral confirmations, PNC produced an Ohio paper-check image showing issuance only—no state deposit stamp. (Ex. 7B.)

41. On May 14, 2025, PNC's trust department wrote that it could "confirm" the April 4, 2025 disbursements were fiduciary income-tax payments to the Internal Revenue Service, the Ohio Department of Taxation, and the Kentucky State Treasurer (Ex. 5A), and on May 21, 2025, referenced internal "confirmation numbers" (Ex. 7A), yet in both instances provided only internal artifacts and the Ohio paper-check image with no state deposit stamp, and no IRS/EFTPS, Ohio, or Kentucky receipts.

42. Categorical refusal (May 29, 2025): PNC's Chief Fiduciary Officer Marie Tormey wrote that "we will not be providing the additional documentation you have requested." (Ex. 9.)

43. Follow-up posture (Aug. 12, 2025): Outside counsel Vorys later stated that no additional third-party confirmations existed beyond internal numbers and invited Plaintiff to seek confirmations from taxing authorities directly. (Ex. 12.)

44. Partial internal production (June 24, 2025): Defendants produced internal artifacts (internal payment spreadsheets and a single cropped page from the Trust's 'Statement of Transactions') but withheld neutral third-party proofs and trace data. (Ex. 10.)

45. Extension posture (May 14, 2025): PNC sent a Form 7004 (Ex. 5B) for the 2024 tax year using a $0/"unknown" cost basis and described routing through a PNC internal account.

46. Advisors invoked: EY was identified as preparer/advisor for the estimated-tax period and was later invoked to defend the "unknown basis" and Kentucky-filing rationales.

47. Trust-funded outside-counsel payments (May-Sept. 2025): Around the time of Plaintiff's oversight requests, PNC paid outside counsel $15,652.50 (four same-day remittances on May 12, 2025), $552.50 (July 15, 2025), and $25,268.41 (Sept. 16, 2025). Defendants produced only non-itemized "summary" invoices and assert charges relate to prior years, but no itemization links the work to those prior years; the September payment has no explanation. (Ex. 14.)

48. In early January 2025, Plaintiff escalated questions about the 2024 distribution mechanics (including realized-gain allocations, income-versus-principal transfers, and extraordinary expenses). PNC, acting through fiduciary advisor Jessica Rawe, responded with an incomplete "principal cash" explanation that did not address those mechanics. Plaintiff reasonably relied on that guidance in planning and later had to incur professional expense to obtain accurate information and corrected statements. (Ex. 15.)

49. On May 7, 2025, Plaintiff emailed PNC's Chief Executive Officer William Demchak and other senior officers regarding the three April 4, 2025 estimated-tax withdrawals and requested neutral third-party confirmations and a full accounting. (Ex. 4.) On May 14,

2025, PNC's Chief Fiduciary Officer Marie Tormey confirmed in writing that Demchak and "others" had received and reviewed that email. (Ex. 5A.)

**C. Forum Nexus**

50. PNC coordinates trust-administration functions for this matter from Philadelphia, PA; the produced Ohio check image bears "PNC Bank, N.A., Philadelphia, PA" in the instrument header. (Ex. 7B.)

**D. Summary of Duties Implicated**

51. These facts implicate baseline duties of prudence, loyalty, accurate recordkeeping, auditable books, and neutral third-party confirmations for substantial payments; internal numbers, spreadsheets, or images are not neutral confirmations.

## CAUSES OF ACTION

**COUNT I**
Breach of Trust
(Defendants: PNC, Individual Co-Trustees)

52. Plaintiff incorporates only ¶¶34–51 (General Allegations) for this Count.

53. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Duties**

54. Trustees must administer the trust in good faith, in accordance with its terms and the interests of the beneficiaries. *See* Ohio Rev. Code ("R.C.") 5808.01.

55. Loyalty: The trustees must act solely in the beneficiaries' interests. R.C. 5808.02.

56. Impartiality: The trustees must treat beneficiaries impartially when making and explaining decisions. R.C. 5808.03.

57. Prudent Administration: The trustees must administer the trust as a prudent person would —exercising reasonable care, skill, and caution, including maintaining accurate classifications, statements, and controls. R.C. 5808.04.

58. Delegation / Agent Oversight: When using agents (e.g., accountants or outside counsel), the trustee must prudently select, instruct, and monitor them. R.C. 5808.07.

59. Recordkeeping: The trustees must maintain adequate, auditable books and keep trust property and transactions clearly identified. R.C. 5808.10.

60. Inform and Report: The trustees must provide material facts and accountings upon request and keep beneficiaries reasonably informed. R.C. 5808.13.

**B. Breach**

61. Trustees misclassified an April 2024 property sale as "income" and issued no corrected statements.

62. On April 4, 2025, Trustees claimed $427,000 in 2024 estimated-tax remittances but produced no neutral third-party confirmations (IRS/EFTPS, state receipts, ACH/NACHA). EFTPS is federal-only and does not verify state payments.

63. Trustees asserted internal routing through PNC account …4718 and provided internal artifacts and spreadsheets instead of neutral deposit proof.

64. In response to requests, Trustees produced only an Ohio paper-check image showing issuance and no state deposit stamp.

65. Trustees refused to provide third-party confirmations (May 29 statement) and later told Plaintiff to seek records from taxing authorities (Aug. 12).

66. Accounting vs. statements: In response to requests for a complete accounting, Trustees provided only annual statements, not an accounting with third-party confirmations and reconciliations.

67. Sale-records request/refusal (June 28-30, 2025): Through counsel, Trustees called Plaintiff's request "somewhat unusual" and did not produce the closing statement, wire/ ACH confirmations, deed/escrow, or internal tie-outs—failing basic recordkeeping and reporting duties.

68. Trust-funded defense spend: On information and belief, during and immediately after Plaintiff's oversight requests, Trustees used Trust funds to pay outside counsel to respond to those requests; the May 12, July 15, and Sept. 16 payments coincided with the requests, the invoices were non-itemized "summaries" labeled as "prior-year" work, and no neutral support tied those charges to any legitimate trust benefit. Even if later proven otherwise, using Trust assets for outside counsel without itemization during beneficiary oversight is imprudent and breaches recordkeeping/reporting duties.

69. Taken together, these acts/omissions breach loyalty, prudence, recordkeeping/reporting, and impartiality duties by misreporting, withholding neutral confirmations, relying on internal numbers and spreadsheets, and funding defense spend from trust assets without demonstrable benefit.

**C. Causation and Prejudice**

70. The breaches distorted statements/allocations, impeded beneficiary oversight, and foreseeably risked or caused misallocation and unnecessary trust expense.

**D. Relief**

71. Under R.C. 5810.01, the Court may: (a) compel a full fiduciary accounting with third-party confirmations and corrected statements; (b) order corrections/reclassifications; (c) surcharge/disgorge imprudent or misallocated costs (including non-itemized trust-funded defense payments) with interest; (d) award fees/costs; and (e) grant declaratory/injunctive relief requiring neutral confirmations for substantial disbursements going forward.

**COUNT II**
Breach of Duty to Inform/Report
(Defendants: PNC, Individual Co-Trustees)

72. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

73. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Duty**

74. A trustee must keep current beneficiaries reasonably informed about trust administration and material facts necessary to protect their interests, and promptly respond to a beneficiary's request for information related to administration, unless unreasonable under the circumstances. R.C. 5808.13(A); *see also* R.C. 5808.10.

**B. Breach**

75. Plaintiff made reasonable, routine requests for (i) IRS/EFTPS confirmation letters for each April 4, 2025 payment and state deposit confirmations; (ii) routing/trace documentation showing the path of funds from the Trust to the tax authorities via internal account …4718; (iii) the identity/authority of trust-level tax counsel and the signed authorization chain for each disbursement; and (iv) April 2024 sale records (closing statement, wire/escrow confirmations, deed, and internal tie-outs).

76. Trustees did not provide those neutral confirmations; they instead pointed to internal artifacts (including …4718 routing) and spreadsheets and produced only an Ohio check image showing issuance without any state deposit stamp.

77. Trustees refused to provide any third-party confirmations and later told Plaintiff to seek records from taxing authorities rather than provide them themselves.

78. For the sale-records request, outside counsel labeled the request "somewhat unusual," and no neutral records were produced; much later, Trustees provided HUD pages only, not the requested wire/ACH confirmations or deed/escrow proofs.

79. In addition, PNC, acting through fiduciary personnel including Jessica Rawe, provided incomplete and misleading distribution guidance regarding the 2024 distribution mechanics, as described in ¶48.

80. Annual statements were invoked, but annual reports under R.C. 5808.13(C) are not a complete accounting and do not satisfy a reasonable request for audit-capable, third-party proofs and trace data.

**C. Reasonability of Requests**

81. These requests sought standard, readily available business records routinely generated by taxing authorities and banks; no undue burden, privilege, or unavailability was identified.

82. Because EFTPS is federal-only and does not verify state payments, neutral state deposit confirmations (or the equivalent of) were necessary to substantiate the reported remittances.

83. In these circumstances, refusing neutral confirmations and routing/trace data was not justified by the "unless unreasonable" proviso.

**D. Causation and Prejudice**

84. The refusals impeded verification of tax remittances and sale proceeds, distorted statements and allocations, and forced additional expense/effort to protect beneficiary interests.

**E. Relief**

85. Order production of a complete fiduciary accounting with neutral third-party confirmations (IRS/EFTPS, state deposit receipts, ACH/NACHA trace data), routing/trace identifiers, and sale records (closing statement, deed/escrow, wire confirmations, internal tie-outs).

86. Award costs, expenses, and attorney's fees as authorized by R.C. 5810.04, grant other equitable relief as authorized by R.C. 5810.01, and enforce reporting duties under R.C. 5808.13.

**COUNT III**
Accounting / Production of Records
(Defendants: PNC, Individual Co-Trustees)

87. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

88. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Authority**

89. The probate court may require a trustee to render an account and inquire into how the trust has been administered. R.C. 2109.30, 2109.32.

90. A trustee must keep adequate records of trust property and keep current beneficiaries reasonably informed of material facts, including by responding to reasonable requests for information. R.C. 5808.10, 5808.13.

91. For breach of these duties, the court may order an accounting, compel production of records, and grant other appropriate equitable relief. R.C. 5810.01.

**B. Breach**

92. Trustees recorded three April 4, 2025 estimated-tax payments as EFTPS-type remittances through internal account …4718, yet produced no EFTPS acknowledgements and no neutral third-party receipts—no IRS/EFTPS confirmation, state deposit receipt or stamp, ACH/NACHA trace data, or cleared-check image.

93. They instead provided internal artifacts (internal payment spreadsheets and a single cropped page from the Trust's 'Statement of Transactions') and a single Ohio check image without a state deposit stamp. They later stated that no other confirmations exist and directed Plaintiff to seek records from taxing authorities.

94. For the April 2024 sale, Trustees initially withheld the HUD/closing statement, wire/ACH or escrow confirmations, deed/escrow records, and internal tie-outs; when a HUD was finally produced, it still came without any neutral deposit or trace proofs.

**C. Relief**

95. Order a complete fiduciary accounting and production of (i) neutral third-party payment confirmations (IRS/EFTPS receipts, state deposit receipts, ACH/NACHA trace data), (ii) routing/trace identifiers and any …4718 sub-ledger ties, and (iii) April 2024 sale records, subject to appropriate privilege/PII redactions; and award fees/costs and further equitable relief.

**COUNT IV**

Uniform Principal and Income Act (UPIA) Violations
(Defendants: PNC, Individual Co-Trustees)

96. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

97. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Governing Rules (UPIA / UTC)**

98. Receipts from the sale of a principal asset must be allocated to principal, not income. R.C. 5812.24(B).

99. A trustee must administer the trust impartially and may adjust between principal and income only as permitted by the trust instrument and the Uniform Principal and Income Act, exercising that power fairly and reasonably to all beneficiaries. R.C. 5812.02, 5812.03.

100. Trustees must keep adequate records, furnish accurate and complete reports, and keep current beneficiaries reasonably informed of material facts, including by correcting any material inaccuracies. R.C. 5808.10, 5808.13.

**B. Breach**

101. Defendants recorded the April 15, 2024 real estate sale as “Rent/Investment Income” on 2024 statements (Ex. 2A) instead of principal, inflating the reported income section (Ex. 2B) and obscuring how sale proceeds were treated.

102. After Plaintiff’s July 22, 2025 notice (Ex. 11), Defendants acknowledged the mislabeling but did not issue corrected 2024 statements or reconciliations, and characterized the error as “clerical” and “immaterial.” (Ex. 12.)

103. Defendants now assert that the proceeds were "ultimately to principal," but they have not provided reconciliations tying the sale to principal accounts, and the income section mislabeling impairs accurate oversight, income-based fee calculations, distributions, and classwide reporting.

104. These acts and omissions violate statutory allocation and impartiality rules and the duties to keep accurate records, accurately report, reasonably inform beneficiaries, and correct material errors.

**C. Relief**

105. Declare that Defendants violated Ohio UPIA/UTC allocation and reporting duties and order Defendants, within a time set by the Court, to issue corrected 2024 statements and reconciliations reflecting proper principal allocation of the April 2024 sale, supported by neutral confirmations and sub-ledger ties, and to cease misclassifying sale proceeds as income. R.C. 5810.01.

106. Aware surcharge, fee-shifting, and any further equitable or monetary relief the Court finds appropriate under R.C. 5810.01.

**COUNT V**
Trustee Removal
(Defendants: PNC, Individual Co-Trustees)

107. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

108. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Legal Standard**

109. On the request of a beneficiary, a court may remove a trustee for serious breach of trust, lack of cooperation substantially impairing administration, unfitness, unwillingness, or persistent failure to administer the trust effectively, or substantial change in circumstances where removal best serves the beneficiaries and is consistent with the trust's material purposes. R.C. 5807.06(A)-(B).

110. In addition to removal, the court may compel duties, order an accounting, suspend a trustee, appoint a special fiduciary, surcharge for losses, and grant other equitable relief necessary to protect the trust and beneficiaries. R.C. 5810.01(B).

**B. Grounds for Removal**

111. Defendants have committed serious, continuing breaches and have persistently failed to administer the Trust effectively, including:

(a) Withholding neutral confirmations and routing/trace data for the April 4, 2025 tax disbursements, providing only internal spreadsheet snippets, internal "confirmation numbers," and an Ohio check image with no state deposit stamp, and later admitting that no additional third-party confirmations exist.

(b) Misclassifying the April 15, 2024 real estate sale proceeds as "Rent/Investment Income" across 2024 statements and failing to timely correct the mislabeling after notice.

(c) Failing to inform and report by refusing reasonable requests for neutral third-party confirmations, routing data, and sale records, contrary to statutory duties to keep beneficiaries reasonably informed and to respond promptly to information requests.

(d) Causing trust-funded payments to outside counsel to resist Plaintiff's oversight requests, without itemized invoices or demonstration that the defense spend benefited the Trust, implicating duties of reasonable costs and loyalty.

(e) Administering tax payments through a masked clearing account while declining to provide neutral proofs from that account to taxing authorities, frustrating verification and accurate reporting.

112. Taken together, these acts and omissions show loss of beneficiary confidence, ongoing reporting and verification failures, and administrative friction such that removal best serves the beneficiaries and is consistent with the Trust's material purposes. A suitable successor (independent fiduciary or special master) is available.

**C. Relief**

113. Under R.C. 5807.06 and 5810.01(B), Plaintiff requests that the Court:

(a) remove PNC as corporate co-trustee and remove or suspend the individual co-trustees;

(b) appoint a special fiduciary or independent trustee to take possession of trust property during transition and administer the Trust;

(c) order a full fiduciary accounting with neutral third-party confirmations, routing/trace data (including any sub-ledger such as account …4718), and corrected statements; and

(d) award surcharge, fee-shifting, and such further equitable relief as the Court deems just.

**COUNT VI**
Fraud — Affirmative Misrepresentation
(Defendants: PNC, Individual Co-Trustees)

114. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

115. Plaintiff brings this claim in her individual capacity only.

**A. Particularized Allegations**

116. On May 14, 2025, PNC's trust department wrote that it could "confirm" the April 4, 2025 disbursements were fiduciary income-tax payments to the IRS, Ohio Department of Taxation, and Kentucky State Treasurer, but provided no IRS/EFTPS acknowledgments, state deposit receipts, or ACH/NACHA confirmations.

117. On May 21, 2025, Trustees referenced internal "confirmation numbers" and again provided only an Ohio paper-check image showing issuance but no state deposit stamp, and no federal or Kentucky confirmations.

118. On May 29, 2025, Trustees stated they would not provide any additional documentation or neutral confirmations for the April 4, 2025 payments.

119. On June 24, 2025, Defendants produced internal artifacts (internal payment spreadsheets and a single cropped page from the Trust's 'Statement of Transactions') and characterized those internal materials as sufficient confirmation, while still omitting neutral third-party proofs and routing/trace data.

120. On Aug. 12, 2025, outside counsel admitted that no additional third-party confirmations existed beyond internal numbers and invited plaintiff to seek confirmations directly from the taxing authorities.

**B. Misrepresentation, Falsity, and Scienter**

121. Defendants acted through senior trust officers, including the Chief Fiduciary Officer, who received Plaintiff's requests, approached or ratified the responses described in ¶¶116-120, and directed that only internal artifacts be provided.

122. Through these statements and related correspondence, Defendants represented that the April 4, 2025 payments were confirmed fiduciary income-tax remittances and that internal artifacts (numbers, spreadsheets, and a check image) were sufficient proof of payment.

123. Those representations were false and misleading when made because Defendants possessed only internal records, had no neutral third-party confirmations, and knew or were reckless in not knowing that such internal artifacts do not show deposit or credit by the IRS or state treasurers.

124. Defendants made or ratified these statements intentionally or, at minimum, with reckless disregard for their truth, to deter Plaintiff from insisting on neutral confirmations and from seeking court oversight.

**C. Reliance and Damages**

125. Plaintiff reasonably relied on Defendants' assurances that the payments were confirmed and, in light of those assurances, deferred stronger remedies while attempting to obtain the promised documentation, incurring fees and costs and suffering delay and prejudice in verifying tax compliance and trust allocations.

**D. Relief**

126. Plaintiff seeks compensatory damages, punitive damages under R.C. 2315.21, and such further legal and equitable relief as the Court deems just.

**COUNT VII**
Fraudulent Concealment (Nondisclosure)
(Defendants: PNC, Individual Co-Trustees)

127. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

128. Plaintiff brings this claim in her individual capacity only.

**A. Duty and Omissions**

129. As trustees and fiduciaries, Defendants had duties to provide accurate, auditable information regarding large tax disbursements and allocations, including neutral third-party confirmations (IRS/EFTPS and state receipts, ACH/NACHA trace data) and corrected beneficiary statements once misclassification and confirmation issues were raised.

130. After Plaintiff's May 7, May 14, and May 21, 2025 written requests, Defendants (i) refused to provide IRS/EFTPS, state, or ACH/NACHA confirmations; and (ii) instead produced only internal artifacts (internal payment spreadsheets and a single cropped page from the Trust's 'Statement of Transactions'), while continuing to describe the payments as "confirmed" estimated-tax remittances.

131. On May 29, 2025, Defendants stated that they would not provide additional documentation, and on Aug. 12, 2025, outside counsel stated that no additional third-party confirmations existed beyond internal numbers and invited Plaintiff to seek confirmations directly from taxing authorities, while trust-funded payments to outside counsel had been made during the same period.

**B. Scienter**

132. Defendants acted through senior trust officers, including the Chief Fiduciary Officer, who received Plaintiff's written requests, approved or ratified the decisions described in

¶¶129-131 to withhold neutral third-party confirmations and corrected statements, and directed that only internal artifacts be provided while trust-funded payments to outside counsel were made.

133. Defendants knew, or were reckless in not knowing, that internal artifacts and a check image without a deposit stamp were not neutral third-party confirmations, and that withholding confirmations, trace data, and corrected statements while maintaining "confirmed" and "paid EFTPS" characterizations would leave Plaintiff with a materially misleading picture of the tax payments and trust records.

**C. Reliance and Damages**

134. Plaintiff reasonably relied on Defendants' partial communications and omissions by deferring court intervention while awaiting neutral proofs and corrected statements, incurring additional oversight and legal costs, time-value loss, and prejudice in verifying tax compliance and monitoring trust allocations and distributions.

**D. Relief**

135. Plaintiff seeks compensatory damages, punitive damages under R.C. 2315.21, and such further legal and equitable relief as the Court deems just.

**COUNT VIII**

Direct Negligence — Chief Fiduciary Officer

(Defendant: Marie Tormey ("Tormey"), in her individual capacity as Chief Fiduciary Officer of PNC)

136. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

137. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Role, Duty, and Notice**

138. As PNC's Chief Fiduciary Officer, Tormey was responsible for fiduciary controls and recordkeeping for significant trust disbursements and for ensuring that beneficiary oversight requests were met with accurate, verifiable information and neutral third-party confirmations of large tax remittances.

139. Tormey received actual notice of Plaintiff's oversight requests and the April 4, 2025 tax remittances no later than May 14, 2025, when PNC engaged with Plaintiff about the $0/ "unknown" cost-basis extension posture and confirmations.

**B. Breach**

140. After notice, Tormey failed to exercise reasonable care by:

(a) Refusing Plaintiff's May 7, May 14, and May 21, 2025 requests for IRS/ EFTPS, state, and ACH/NACHA confirmations;

(b) Directing or allowing only internal, bank-generated spreadsheets and single cropped page from the Trust's 'Statement of Transactions,' plus an Ohio check image without a deposit stamp, to be produced as "sufficient" confirmation; and

(c) Maintaining that no additional third-party confirmations existed and inviting Plaintiff to seek proof directly from the taxing authorities while trust-funded payments to outside counsel were being made.

**C. Causation and Injury**

141. Tormey's negligent handling of Plaintiff's oversight request proximately caused pecuniary loss by prolonging withholding of trust funds tied to the April 4, 2025 payments, delaying

verification and correction of allocations, and requiring Plaintiff to incur professional and oversight expenses to obtain neutral confirmations and corrected reporting.

**D. Relief**

142. Plaintiff seeks compensatory damages, including reasonable oversight and professional costs proximately caused, and such further legal and equitable relief as the Court deems just.

**COUNT IX**

Direct Negligence — General Counsel

(Defendant: Laura Long ("Long"), in her individual capacity as General Counsel of PNC)

143. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

144. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Role and Notice**

145. As PNC's General Counsel, Long had authority to coordinate legal-risk and fiduciary-operations responses to Plaintiff's oversight requests, including ensuring that the fiduciary unit obtained neutral third-party confirmations and completed a corrected fiduciary accounting for the April 4, 2025 estimated-tax disbursements.

146. On July 22, 2025, Plaintiff's counsel sent Long a detailed letter (Ex. 16A) describing the continuing absence of neutral confirmations (IRS/EFTPS, state receipts, ACH/NACHA trace data) for the April 4, 2025 payments and requesting a full fiduciary accounting with any necessary corrections; on July 23, 2025, PNC's outside counsel confirmed Long's receipt of that letter. (Ex. 16B.)

**B. Duty**

147. After receiving notice, Long owed Plaintiff a duty of reasonable care, independent of any attorney-client relationship with PNC, to exercise her authority to:

(a) cause production of neutral third-party confirmations for the April 4, 2025 payments;

(b) identify and reconcile the internal routing account used for those withdrawals; and

(c) cause completion of a corrected fiduciary accounting with appropriate reclassifications and preserved supporting records.

**C. Breach**

148. Despite that notice and authority, Long failed to exercise reasonable care by:

(a) allowing the fiduciary unit and outside counsel to continue withholding neutral confirmations and routing/trace data;

(b) permitting continued reliance on internal spreadsheets, statement excerpts, and a check image lacking a state deposit stamp as "sufficient" proof of payment; and

(c) allowing a refusal-to-verify posture instead of directing independent verification through taxing authorities or clearing channels.

**D. Causation and Damages**

149. Long's post-notice inaction proximately caused pecuniary loss to Plaintiff by:

(a) prolonging the absence of neutral confirmations and a corrected accounting for the $427,000 April 4, 2025 remittances;

(b) delaying verification and correction of trust allocations and tax/cost basis posture; and

(c) necessitating additional professional and oversight costs to obtain confirmations and corrected reporting.

150. Plaintiff seeks compensatory damages, including reasonable oversight and professional costs proximately caused, and such further legal and equitable relief as the Court deems just.

**COUNT X**

Direct Negligence — Chief Executive Officer
(Defendant: William Demchak ("Demchak"), in his individual capacity as Chief Executive Officer of PNC)

151. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

152. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Role, Notice, and Duty**

153. As Chief Executive Officer of PNC, Demchak had authority to direct fiduciary-operations leadership to maintain audit-capable records, obtain neutral third-party confirmations for substantial trust disbursements, and ensure that requested fiduciary accountings were completed.

154. By May 14, 2025, Demchak had actual notice of Plaintiff's concerns and requests for neutral confirmations and a full accounting, through Plaintiff's May 7, 2025 email and Tormey's written confirmation that the email had been shared with him. Once on notice, Demchak owed a duty of reasonable care to cause PNC's fiduciary unit to obtain and

produce neutral payment proofs, reconcile the internal routing path for the April 4, 2025 withdrawals, and complete a corrected fiduciary accounting.

**B. Breach**

155. Despite that notice and authority, Demchak failed to exercise reasonable care by not causing production of neutral third-party confirmations, by allowing continued reliance on internal spreadsheets, statement excerpts, and a check image lacking a state deposit stamp, and by allowing PNC to continue drawing Trust funds to outside counsel without first obtaining neutral confirmations and a corrected accounting.

**C. Causation and Injury**

156. Demchak's post-notice inaction was a substantial factor in prolonging the absence of neutral verification for $427,000 in April 4, 2025 estimated-tax withdrawals, delaying corrections and accounting, and causing pecuniary loss, including loss of use/time value of Trust funds and reasonable professional/oversight costs incurred to compel confirmations and a corrected accounting.

**D. Relief**

157. Plaintiff seeks compensatory damages, including reasonable oversight and professional costs proximately caused, and such further legal and equitable relief as the Court deems just.

**COUNT XI**
Professional Negligence / Accounting Malpractice
(Defendant: EY)

158. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

159. EY served as the Trust's external tax advisor during the 2024 estimated-tax period.

160. This claim is pled in the alternative to trustee-only liability. Plaintiff does not seek double recovery; any judgement against EY will be adjusted to avoid overlap with the trustees counts.

161. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Role and Duty**

162. EY prepared or advised on the Trust's 2024 estimated-tax computations, including the April 4, 2025 remittances and the Form 7004 extension described in the General Allegations. EY knew its work would be used to guide fiduciary decisions and beneficiary communications regarding those payments.

163. In that role, EY owed Plaintiff and similarly situated beneficiaries a duty to exercise reasonable professional care in (a) evaluating available cost basis and income information, (b) recommending filing positions and estimated-tax amounts, and (c) avoiding positions or communications that would mislead beneficiaries when used in place of neutral confirmations.

**B. Breach**

164. EY breached its duty by endorsing or supplying positions that:

(a) used a $0/"unknown" cost basis to compute the April 4, 2025 estimated-tax remittances even thought the Trust's November 28, 2023 account statement already reported a specific market value and tax cost basis for the Grand Avenue property. (Ex. 1.)

(b) supported April 4, 2025 estimated-tax payments totaling $427,000—including a $12,000 Kentucky payment—without first aligning those amounts with documented Kentucky-source income or neutral federal and state confirmations; and

(c) were invoked in the Aug. 12, 2025 correspondence to defend the "unknown basis" and Kentucky-filing rationales instead of providing neutral IRS/EFTPS and state receipts, reinforcing advocacy in place of verification.

**C. Causation and Loss**

165. EY's breaches were a substantial factor in:

(a) the April 4, 2025 estimated-tax payments being calculated, routed through internal account …4718, and reported without neutral confirmations;

(b) Trust cash being withheld or misallocated and losing time-value while the basis and filing posture were reconciled; and

(c) professional expenses reasonably incurred to obtain neutral confirmations, correct reporting, and re-classify misallocated sums.

**D. Relief**

166. Plaintiff seeks judgment against EY for professional-negligence damages, including surcharge restoring any overpaid or withheld Trust principal attributable to EY's positions, reasonable oversight and professional costs, pre- and post-judgement interest, and such further legal and equitable relief as the Court deems just.

**COUNT XII**
Aiding and Abetting Breach of Trust
(Defendant: EY)

167. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

168. EY served as the Trust's external tax advisor during the 2024 estimated-tax period.

169. This claim is pled in the alternative to trustee-only liability. Plaintiff does not seek double recovery; any judgement against EY will be adjusted to avoid overlap with the trustees counts.

170. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. EY's Role and Knowledge**

171. EY served as the Trust's external tax advisor during the 2024 estimated-tax period and is identified as preparer on the Projected 2024 Schedule K-1 materials issued to beneficiaries.

172. On Aug. 12, 2025, PNC (through counsel) attributed to EY two positions used to defend the April 4, 2025 withdrawals: (a) that the cost basis for the property could not be confirmed before the filing deadline and therefore a $0/"unknown" basis was used, and (b) that a Kentucky fiduciary filing would be pursued because a co-trustee resided in Kentucky.

173. For purposes of the Form 7004 extension and the April 4, 2025 estimated-tax remittances totaling $427,000, PNC—through its tax preparer—treated the property's cost basis as $0/"unknown" even though its November 28, 2023 Trust records and account statements already identified a concrete tax-cost basis. (Ex. 1.)

174. Based on its preparer role and these communications, EY knew or was willfully blind to the trustees' breaches, including misclassification of the sale, the placeholder zero-basis

posture contrary to existing records, and the withholding of neutral confirmations while using EY-branded positions to justify the April 4 withdrawals.

**B. Substantial Assistance**

175. With that knowledge, EY substantially assisted the trustees' breaches by:

(a) preparing and endorsing the $0/"unknown" basis and Kentucky-filing positions that were used to justify the April 4 withdrawals;

(b) supplying EY-branded tax materials, including the Projected 2024 K-1, that trustees used to communicate and justify those withdrawals to beneficiaries; and

(c) failing to qualify, correct, or withdraw those positions once conflicts with valuation data and governing filing rules were evident, thereby enabling the trustees' ongoing refusal to provide neutral confirmations and corrected accounting.

**C. Causation and Injury**

176. EY's professional positions, invoked in place of neutral IRS/EFTPS and state receipts and coupled with statements that no further confirmations existed, reduced pressure to correct the breaches and were a substantial factor in the harms suffered, including withheld or overpaid funds, time-value loss, and professional expenses reasonably incurred to obtain confirmations, corrections, and a complete accounting.

**D. Relief**

177. Plaintiff seeks judgment against EY for aiding and abetting breach of trust; surcharge and compensatory damages (jointly and severally with the Trustee Defendants as permitted),

disgorgement of fees paid from Trust assets, corrective and injunctive relief, pre- and post-judgment interest, and such further legal and equitable relief as the Court deems just.

## COUNT XIII
Aiding and Abetting Breach of Trust
(Defendant: Vorys)

178. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

179. Vorys served as outside counsel to the Trustee Defendants on the trust-administration matters described in ¶¶34-51.

180. This Count is pled in the alternative to the other remedies based on the same facts. Plaintiff does not seek double recovery; any judgment against Vorys on this Count will be adjusted to avoid overlap with trustee and unjust-enrichment relief.

181. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

**A. Trustee Breaches Predicated**

182. The Trustee Defendants breached their duties of loyalty, prudence, accurate recordkeeping, reasonable-expense administration, proper income/principal allocations, and information/accounting by: (a) misclassifying the April 2024 sale, (b) taking the April 4, 2025 estimated-tax withdrawals without neutral third-party confirmations, (c) routing those withdrawals through an internal PNC account while withholding EFTPS, state, and ACH/NACHA proofs, and (d) diverting trust assets to outside counsel on non-itemized, “prior-year” invoices during the oversight dispute.

**B. Vorys’s Knowledge**

183. After Plaintiff's May 2025 oversight requests, PNC paid Vorys trust-sourced amounts on or about May 12, July 15, and Sept. 16, 2025, while producing only non-itemized "summary" invoices labeled as prior-year work and a new 2025 matter with no explanation.

184. On Aug. 12, 2025, Vorys—acting for the trustees—stated that no additional third-party confirmations existed for the April 4 withdrawals and directed Plaintiff to seek confirmations from taxing authorities instead, despite the ongoing dispute over trust-benefit and verification.

185. These post-notice payments, non-itemized invoices, and "no further confirmations" statements support a reasonable inference that Vorys knew, or was at least willfully blind to, the underlying trustee breaches described above.

**C. Substantial Assistance**

186. With that knowledge, Vorys substantially assisted the breaches by:

(a) accepting, retaining, and billing against trust-sourced funds to advise trustees, prepare responses, and proceed without neutral confirmations or itemized support;

(b) relying on internal artifacts and positions attributed to EY (including the $0/"unknown" basis and Kentucky-filing rationales) to defend the April 4 estimated-tax withdrawals and continued non-production; and

(c) substituting professional advocacy in place of third-party proof, thereby helping the trustees resist neutral confirmations, corrected accounting, and surcharge review.

187. Vorys's financial facilitation and advocacy made it materially easier for the trustees to maintain the challenged withdrawals, non-production, and misreporting.

### D. Causation

188. Vorys's knowing and substantial assistance was a substantial factor in allowing Trustee Defendants to persist in the breaches described above, causing the harms alleged, including withheld or overpaid funds, time-value loss on Trust cash, professional expenses to obtain neutral confirmations and corrected reporting, and related classwide injuries.

### E. Relief

189. Plaintiff seeks judgment against Vorys for aiding and abetting breach of trust; surcharge and compensatory damages; disgorgement of all trust-funded payments to Vorys related to the matters at issue; a full itemized accounting of those payments; appropriate corrective and injunctive relief regarding future trust-funded defense payments; pre- and post-judgment interest, costs, and such further legal and equitable relief as the Court deems just.

## COUNT XIV

Unjust Enrichment / Money Had and Received
(Defendant: Vorys)

190. Plaintiff incorporates only ¶¶34-51 (General Allegations) for this Count.

191. This equitable Count is pled in the alternative to Plaintiff's legal claims against Vorys. Plaintiff seeks restitution only once and does not seek double recovery.

192. Plaintiff brings this Count individually and on behalf of the Beneficiary Class under Rule 23(b)(3) for monetary and related relief.

### A. Allegations

193. Vorys received money paid out of the Trust on May 12, July 15, and September 16, 2025, as shown by Trust ledger entries and Vorys matter numbers and remittance references.

194. These payments were drawn from Trust accounts and approved and recorded on non-itemized "summary" invoices, without the neutral third-party confirmations ordinarily used to validate large trust disbursements, despite Plaintiff's oversight requests.

195. The amounts are specifically identifiable and traceable to Trust assets by date, amount, account, and matter number.

196. In equity and good conscience, Vorys may not retain Trust-sourced funds paid on opaque, non-itemized charges while the trustees withhold neutral confirmations; unless a proper accounting shows a legitimate Trust benefit, those funds should be returned or held for the Trust.

197. Legal remedies alone are inadequate because the charges and authorizations remain opaque; equitable restitution, constructive trust or escrow, and a full itemized accounting are necessary to prevent dissipation and restore Trust funds.

**B. Relief**

198. Plaintiff seeks judgment against Vorys for unjust enrichment / money had and received in the amount of Trust funds paid; disgorgement and restitution of all Trust-sourced fees; imposition of a constructive trust and/or escrow over those amounts pending final judgement; a full itemized accounting of all Trust-funded payments to Vorys relating to the matters at issue; appropriate injunctive relief regarding future Trust-funded defense payments absent Court approval; pre- and post-judgment interest, costs, and such further legal and equitable relief as the court deems just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

A. Certify the Class under Rule 23, appoint Plaintiff as class representative, and appoint her counsel as class counsel;

B. Declare that Defendants violated their trust, statutory, fiduciary, and professional duties as alleged;

C. Enter injunctive relief requiring neutral third-party confirmations, corrected statements, compliant trust-administration practices, and appropriate limits on trust-funded defense payments;

D. Order a full fiduciary accounting of the Trust and the challenged transactions, with supporting neutral third-party confirmations and routing/trace records;

E. Award surcharge, restitution, disgorgement, and money-had-and-received relief restoring all Trust funds wrongfully paid, withheld, or misallocated, including overpaid or misapplied tax remittances and trust-funded payments to outside counsel;

F. Award compensatory and, where permitted, punitive or exemplary damages;

G. Award pre- and post-judgment interest, reasonable attorneys' fees, and costs as allowed by law; and

H. Grant such other legal and equitable relief as set forth in the Trustee-Removal Count, including removal as PNC as trustee, removal or suspension of the individual co-trustees, and appointment of a successor trustee.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues triable as of right.

Date: November 21, 2025

Respectfully submitted,

/s/ *Samuel C. Feldman*
Samuel C. Feldman, Esq.
FELDMAN LAW FIRM PLLC
71 Northeast 27th Avenue
Pompano Beach, FL 33062
T: 954-682-8590
F: 954-941-7003
E: sam@feld.law

*Counsel for Plaintiff Kristin Carlson*

**CERTIFICATE OF SERVICE**

I certify that on November 21, 2025, a true and correct copy of the foregoing was electronically filed on the CM/ECF system, which will serve it via electronic mail to counsel of record.

By: /s/ *Samuel C. Feldman.*
Samuel C. Feldman, Esq.